RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000184-MR

TRENTON EASTERLING      APPELLANT

ON APPEAL FROM MERCER CIRCUIT COURT
V.      HONORABLE DARREN PECKLER, JUDGE
NO. 16-CR-00077

COMMONWEALTH OF KENTUCKY      APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

### AFFIRMING

Trenton Easterling appeals from a judgment of the Mercer Circuit Court convicting him of murder and sentencing him to thirty years in prison. Easterling contends the trial court erred by 1) denying his motion to suppress a videotaped statement; 2) denying his motions for a mistrial and a new trial; and 3) denying his motion to prohibit the introduction of gruesome photographs. The first issue involves portions of a videotaped conversation between Easterling and family members that took place in an interrogation room shortly after he was arrested. The admissibility of this family conversation, taped without the knowledge of the participants, is an issue of first impression in Kentucky. Finding no reversible error, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Seventeen-year-old Tristan Cole, having sustained three gunshot wounds, was found dead at a vacant house in the Deep Creek area in Mercer County the evening of April 13, 2016. Investigators quickly determined that Cole was last seen with then sixteen-year-old Easterling.

Easterling had recently been spending time at the home of Zachary Lay, a senior at the high school Easterling attended. Lay was a known drug dealer who usually kept a handgun in a safe for protection. Interested in helping protect Lay, Easterling obtained an AR-15 rifle from Cole and took it to Lay for potential purchase but Lay decided the gun was too expensive. Easterling then had the idea to steal the gun from Cole, even though Lay did not want him to.

On April 12, Easterling obtained a ride from Lay's home to a Harrodsburg park. The driver, Jerrard Smith, witnessed Easterling going over to Cole's red truck. Shortly afterward, Travis Stephens observed the red truck in his driveway on Deep Creek. Two other witnesses also saw Easterling in the passenger seat of the truck around the same time.

Soon afterward, Easterling called and asked Lay to pick him up at Deep Creek Baptist Church. Lay took Smith with him to the church and they found Easterling in the cemetery area of the grounds. When Easterling got into Lay's vehicle, he handed Lay his own handgun from the safe. Easterling told Lay he had smashed a rock in Cole's face and shot him three times. Easterling's hand had blood on it and he showed Lay and Smith that he had taken Cole's wallet. He said he had killed Cole in order to protect Lay.

2

The Kentucky State Police, with the assistance of the Mercer County Sheriff's Department, investigated the homicide. On April 14, 2016, a detective and a deputy interviewed Easterling at the sheriff's department[1] with his mother present. Easterling confessed he shot Cole three times, but the confession was later suppressed because the officers did not read Easterling his *Miranda* rights prior to questioning him. Upon hearing her son's confession, Easterling's mother terminated the interview by asking for an attorney. Easterling's grandfather then joined Easterling and his mother in the interview room and Easterling, in response to a question from his grandfather, again acknowledged that he had killed Cole.

Easterling was tried for murder and first-degree robbery. After hearing from numerous witnesses, the jury found Easterling guilty of murder but acquitted him of the robbery charge. The trial court sentenced Easterling to thirty years in prison in accordance with the jury's recommendation. This appeal followed.

Additional facts pertinent to Easterling's claims of error are set forth below.

## ANALYSIS

Easterling claims the trial court erred by 1) denying his motion *in limine* to suppress the videotaped statement he made to family members while in the

---

[1] Although the interview occurred at the sheriff's department, we refer to the physical location as a police station given that the Mercer County Sheriff, along with Kentucky State Police, were the investigating law enforcement officials in this case.

police station interrogation room; 2) denying his motions for a mistrial and a new trial due to comments by the Commonwealth; and 3) denying his motion *in limine* to prohibit introduction of gruesome photographs from the crime scene and autopsy. For reasons stated below, we find no reversible error.

## I. THE TRIAL COURT DID NOT ERR BY ADMITTING THE VIDEOTAPED STATEMENT EASTERLING MADE TO FAMILY MEMBERS.

Easterling first claims the trial court erred by declining to suppress the videotaped statement he made to his mother and grandfather. As noted earlier, Easterling was interrogated in a room at the Mercer County Sheriff's Department where he confessed to a detective that he had killed Cole. When his mother requested an attorney, the officers left the room, but Easterling and his mother remained there and Easterling's grandfather joined them. During their conversation, Easterling stated in response to one of his grandfather's questions, "He threatened my friend." Unbeknownst to them, the family's conversation was also videotaped. Although the trial court suppressed the interrogation conducted by the detective because Easterling was not read his *Miranda* rights, the trial court denied suppression of Easterling's incriminating statement made during the conversation with his family members.[2]

---

[2] Easterling's motion *in limine* to suppress was filed February 16, 2018, and heard February 19, the first morning of trial; the Commonwealth's response was filed February 19 as well. No evidentiary hearing was held. The trial court orally denied the motion, concluding Easterling did not have an expectation of privacy in the sheriff's office interrogation room. The next day, after hearing avowal testimony to support Easterling's contention that he and his family members had an expectation of privacy, the trial court denied Easterling's motion to reconsider the suppression of the videotaped statement and entered a written order.

Easterling presents two arguments in support of his claim that the statement was illegally obtained evidence and should have been excluded, one based on Kentucky statutes and the other based on constitutional grounds. First, he asserts Kentucky Revised Statute (KRS) 526.020, prohibiting eavesdropping, was violated when the police officers recorded his conversation. Second, he claims the Fourth Amendment violation that resulted in the suppression of the detective's interrogation led to his arrest which in turn led directly to the statement in question, rendering it fruit of the poisonous tree. We review these questions of law *de novo*. *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 606 (Ky. 2012).

The trial court denied the suppression motion reasoning: 1) KRS 526.020 implies that a person must have an expectation of privacy, making it inapplicable to events at a police station, and thus posing no obstacle to admitting the conversation in question; and 2) the video was not fruit of the poisonous tree because it was not derivative of the suppressed statements, but was the result of a separate action in which law enforcement was not involved.

### A. KRS 526.020

Under KRS 526.020, a person is guilty of a Class D felony when he intentionally uses any device to eavesdrop, whether or not he is present at the time. "'Eavesdrop' means to overhear, record, amplify or transmit any part of a wire or oral communication of others without the consent of at least one (1) party thereto by means of any electronic, mechanical or other device." KRS 526.010.

Easterling argues that eavesdropping occurred because neither Melissa Easterling, William Lay, nor he knew their conversation was being recorded—the room contained no signs informing occupants that their conversation could be recorded and none of the officers gave them verbal warnings. Furthermore, none of the parties to the conversation signed a waiver reflecting that their conversation in the interview room could be recorded and used against Easterling. Although KRS 526.070 contains two exceptions to the eavesdropping statute, Easterling correctly notes that neither of those exceptions applies here.[3]

The Commonwealth, on the other hand, contends that KRS 526.020 itself is inapplicable to this case. Citing *Beach v. Commonwealth*, 927 S.W.2d 826 (Ky. 1996), the Commonwealth maintains that since the exclusionary rule applies to constitutional errors and not statutory violations, even if KRS 526.020 were violated, the video clip would still be admissible because it was

---

[3] KRS 526.070 states:

A person is not guilty under this chapter when he:
(1) Inadvertently overhears the communication through a regularly installed telephone party line or on a telephone extension but does not divulge it; or
(2) Is an employee of a communications common carrier who, while acting in the course of his employment, intercepts, discloses or uses a communication transmitted through the facilities of his employer for a purpose which is a necessary incident to the rendition of the service or to the protection of the rights or the property of the carrier of such communication, provided however that communications common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

6

not obtained in a manner which violated Easterling's constitutional rights.[4]

*Beach* holds that evidence obtained in violation of a state statute will not be excluded unless it involves a violation of constitutional rights or the legislature mandates exclusion.

In *Beach*, the defendant sought suppression of blood test results. Beach argued that the officer, suspecting she was driving under the influence, violated the procedure prescribed by KRS 189A.103 for impairment testing by taking a blood test instead of first conducting a breathalyzer test. Although this Court concluded that there "is no priority expressed in the statute and no preferred method for determining blood alcohol content," the Court went further and stated:

> Under any set of circumstances, the blood test results were admissible. Exclusion of evidence for violating the provisions of the informed consent statute is not required. It has been held in Kentucky and elsewhere that in the absence of an explicit statutory directive, evidence should not be excluded for the violation of provisions of a statute where no constitutional right is involved. *See Little v. Commonwealth*, Ky., 438 S.W.2d 527 (1968). . . .

---

[4] The Commonwealth also cites *Brock v. Commonwealth*, 947 S.W.2d 24, 29 (Ky. 1997), for the premise that the exclusionary rule only applies to constitutional errors. In *Brock*, the Commonwealth unsuccessfully sought to exclude evidence as violative of the eavesdropping statute. Specifically, the defendant sought to introduce a recording to impeach a witness. The trial court sustained the prosecution's objection, reasoning the conversation was merely cumulative evidence. 947 S.W.2d at 29. On appeal, although the record was silent as to whether the recording was obtained without the consent of one of the parties to the conversation, the Commonwealth argued that the taped conversation was properly suppressed because it was illegally obtained in violation of KRS 526.020. *Id.* Citing *Beach*, this Court concluded the taped conversation could not be excluded on those grounds because, even if the conversation violated the eavesdropping statute, the exclusionary rule only applies to evidence obtained in violation of a constitutional right. In light of the tape being obtained through private citizen actions and not through state action, constitutional rights were not implicated. *Id.*

> [T]he statute contains no explicit or implicit directive from
> the General Assembly that requires exclusion of evidence obtained.
> The United States Supreme Court has held that a blood test does
> not violate the Federal Due Process Clause, the Fifth Amendment
> against self-incrimination, the Sixth Amendment right to counsel
> or the Fourth Amendment right to unlawful search and seizure.
> *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d
> 908 (1966).
>
> Exclusion of evidence for violating the provisions of the
> implied consent statute is not mandated absent an explicit
> statutory directive. Evidence should not be excluded for violation
> of the statute's provisions where no constitutional right is involved.
> *Little, supra.*

*Id.* at 828.

KRS 526.020 does not contain a provision, either explicitly or implicitly, that requires exclusion of evidence obtained through its violation. Pursuant to *Beach* then, if the recording at issue was constitutionally obtained, it is admissible.

The trial court's written order made findings that the defendant was in custody in a police station, charged with a crime. He was sitting in an interrogation room with officers in the area, and a camera/microphone was visible on the wall near the room's ceiling. The trial court concluded that Easterling could not have had an expectation of privacy under these circumstances and that little or no significant difference exists between his conversation with his family and a typical "jail house" conversation.

Turning to the question of whether the videotape of the incriminating statement Easterling made to family members in a police station interrogation room was obtained in violation of the Fourth Amendment, we note again that this is an issue of first impression in Kentucky. Whether an individual has a

reasonable expectation of privacy in police interrogation rooms, while never addressed by this Court or our Court of Appeals, has been considered bv both state and federal courts.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Constitution's protection extends only to legitimate expectations of privacy,[5] that is, those situations where the defendant has exhibited an actual (subjective) expectation of privacy, and where the expectation is one that society is prepared to recognize as reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Pursuant to *Katz*, however, the defendant must prove that he expected privacy and that he took normal precautions to protect his privacy. *See Rakas v. Illinois*, 439 U.S. 128, 152 (1978) (citations omitted). But, as Fourth Amendment protection is also dependent on society recognizing the expectation as reasonable, it is not enough that a defendant desired or anticipated privacy. *Id.* at 152 (Powell, J. concurring) (citing to Justice Harlan's concurring opinion in *Katz*). "The ultimate question, therefore, is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances." *Id.* Although Easterling and his family may have had a subjective expectation of privacy, the trial court did not make findings as to the subjective element, but

---

[5] "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted).

9

rather disposed of the motion by concluding, essentially, that society does not recognize such an expectation in these circumstances as reasonable.

Easterling cites *Katz* for the proposition that "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351 (internal citations omitted). Easterling emphasizes the actions he and his family took to maintain his privacy in the interrogation room, including sitting close together and speaking softly. Having considered the facts and guided by precedent from other jurisdictions addressing seemingly private conversations in police stations and vehicles, we conclude that the trial court correctly declined to suppress the videotape.

Cases from several other jurisdictions support the Commonwealth's position that Easterling did not have a reasonable expectation of privacy,[6] with *Lanza v. State of New York*, 370 U.S. 139 (1962), a United States Supreme Court case, providing the basis for this line of authority. In *Lanza*, the police recorded a jail visiting-room conversation between Lanza and his incarcerated brother. *Id.* at 139, 141. When Lanza appeared to testify before a legislative committee investigating possible corruption, he refused to answer questions

---

[6] The Commonwealth cites several cases including *Donaldson v. Superior Court*, 672 P.2d 110 (Cal. 1983); *State v. Howard*, 728 A.2d 1178, 1183 (Del. 1998); *Belmer v. Commonwealth*, 553 S.E.2d 123 (Va. App. 2001); and *Rashid v. State*, 737 S.E.2d 692 (Ga. 2013).

10

based on the secret recording and ultimately was convicted of a misdemeanor based on this refusal. *Id.* at 140. Although the Supreme Court upheld Lanza's conviction on other grounds, it also addressed the Fourth Amendment implications of an electronically recorded jail communication. The Supreme Court's dicta suggested that a jail visiting room is not an area protected by the Fourth Amendment. *Id.* at 143-44. More specifically, "a jail shares none of the attributes of privacy of a home, an automobile, an office or a hotel room. In prison, official surveillance has traditionally been the order of the day." *Id.* at 143.

Despite the recognition of *Lanza*'s pre-*Katz* "protected-areas" dicta, many courts have cited *Lanza* as the basis for concluding that a person who is in police custody or confinement does not have a reasonable expectation of privacy with regard to his or her statements, whether made to officers or others. *See e.g., Belmer v. Commonwealth,* 553 S.E.2d 123, 128 (Va. App. 2001) (quoting *Ahmad A. v. Superior Court,* 263 Cal. Rptr. 747 (Cal. App. 1990) and its description of cases). Although not cited in *Belmer, Hudson v. Palmer,* 468 U.S. 517 (1984), a post-*Katz* United States Supreme Court case, also seemingly relies on *Lanza*'s dicta, *see id.* at 527, in holding that a prisoner does not have a reasonable expectation of privacy under the Fourth Amendment which would protect his cell from unreasonable searches and seizures, *id.* at 526.

As in this case, the *Belmer* court was confronted with the issue of whether society recognizes a reasonable expectation of privacy for a defendant

11

who manifests a subjective expectation of privacy in a closed interview room. In that case, a juvenile was arrested and taken to police headquarters. 553 S.E.2d at 125. After the juvenile was placed in an interview room, with his mother and her boyfriend present, he was *Mirandized* by the detective. *Id.* The juvenile invoked his right to an attorney through his mother's boyfriend and the detective then left the room. *Id.* The detective went to a nearby monitoring room and through its equipment overheard the juvenile making incriminating statements. *Id.*

The Virginia Court of Appeals concluded the overheard conversation was admissible, stating:

> The whispered conversation between appellant, his mother, and her boyfriend occurred in the police station's interview room, a room designed for the disclosure, not the hiding, of information. The room had a one-way glass mirror. [The detective] did not suggest appellant could speak freely to his mother and her boyfriend without fear of eavesdropping. The police were in the middle of an investigation into an armed robbery, and appellant knew he was an object of that inquiry. He had no reason to believe this interrogation room was a "sanctuary for private discussions."

553 S.E.2d at 128–29.

Although Easterling attempts to distinguish *Belmer* from the instant case by pointing out that the police interview room in that case had a glass window "through which interviews can be heard and observed" and Belmer's mother and boyfriend passed a sign in the lobby that warned conversations were recorded, we cannot view those differences as changing society's view that a reasonable expectation of privacy does not exist in a police interrogation room.

12

As the United States Court of Appeals for the Eighth Circuit explained in *United States v. Clark*, 22 F.3d 799 (8th Cir. 1994), society does not recognize that a suspect has a reasonable expectation of privacy in areas controlled by the police. Addressing whether a reasonable expectation of privacy is violated by the secret recording of a defendant's conversation in a police vehicle, the *Clark* court observed:

> A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions. A police car is not the kind of public place, like a phone booth (*e.g., Katz . . .*), where a person should be able to reasonably expect that his conversation will not be monitored. In other words, allowing police to record statements made by individuals seated inside a patrol car does not intrude upon privacy and freedom to such an extent that it could be regarded as inconsistent with the aims of a free and open society.[7]

*Id.* at 801-02.

We find the reasoning expressed in *Belmer* and *Clark* persuasive. Here, Easterling was in custody at the sheriff's department, handcuffed and under arrest, with a camera visible upon the wall of the interrogation room where he was being held. He had no reason to believe the interrogation room was a "sanctuary for private discussions." *Belmer*, 553 S.E.2d at 129; *Clark*, 22 F.3d

---

[7] *Clark*, 22 F.3d at 801, describes its reasonableness inquiry as "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society."

at 802. "Simply leaving a suspect alone with another individual while in police custody does not create a reasonable expectation of privacy that society is prepared to recognize." *Belmer*, 553 S.E.2d at 129 (citations omitted). Accordingly, we conclude that Easterling's Fourth Amendment rights were not violated when his conversation with family members in the interrogation room was videotaped and a portion of that tape was later introduced at trial. The trial court did not err by denying Easterling's motion to suppress.

## B. FRUIT OF THE POISONOUS TREE

Easterling also claims the incriminating statement made to his grandfather, "He threatened my friend," is "fruit of the poisonous tree." He contends the statement flowed from the non-*Mirandized* confession he made to the detective, which the trial court properly excluded, and the connection to that illegally obtained statement provides yet another reason the trial court erred by permitting the Commonwealth to introduce a portion of his videotaped statement to family members.

Easterling reasons that the suppressed confession led to his arrest and the arrest then led directly to the statement to his family members. In his view, if there had been no arrest, Easterling would not have made the statement, "He threatened my friend." The record reflects that Easterling's statements to family members were made in the same room and within two minutes of the illegally obtained confession. Easterling maintains that but for that illegally obtained statement, his family would not have been in that room

14

to speak with him, and thus the recording was obtained solely as a result of the original improperly obtained statement.

"[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citations omitted). Exclusion applies to both the "primary evidence obtained as a direct result of an illegal search or seizure" and to the "fruit of the poisonous tree" – "evidence later discovered and found to be derivative of an illegality." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). Evidence is not fruit of the poisonous tree "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence is "poisoned" if it comes by exploitation of the primary illegality, or not by means sufficiently distinguishable to be purged of the primary taint. *Id.* at 488 (citing Maguire, *Evidence of Guilt*, 221 (1959)). In plain terms, the illegally obtained evidence is exploited if it is used to obtain other evidence. *See Hedgepath v. Commonwealth*, 441 S.W.3d 119, 126 (Ky. 2014); *Wong Sun*, 371 U.S. 471.

Recognized exceptions to the exclusionary rule "involve the causal relationship between the unconstitutional act and the discovery of evidence." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). One exception, at issue here, is the so-called attenuation doctrine. Under that doctrine, "if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint [imposed by the original illegality]'"

15

the evidence is not excluded. *Segura*, 468 U.S. at 805 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). An attenuated connection occurs "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 136 S. Ct. at 2061.

Moreover, "[e]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). "[B]ut-for cause, or 'causation in the logical sense alone,' can be too attenuated to justify exclusion." *Id.* at 592 (citing *United States v. Ceccolini*, 435 U.S. 268, 274-275 (1978)) (internal citation omitted). Nevertheless, even if the challenged evidence is not held to be attenuated, it still may be admissible if "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* at 593.

In this case, it is undisputed that Easterling's confession was obtained through a violation of the Fifth Amendment. The confession was obtained after police failed to inform him of his *Miranda* rights and the trial court appropriately suppressed it. The only question is whether there was sufficient attenuation to dissipate the taint of Easterling's unlawful confession such that the later statement to his family members is admissible.

Under the exploitation analysis, we consider whether the police exploited one event, Easterling's unlawful confession, to achieve a second event, Easterling's incriminating statement to his family. Or stated another way, we

16

consider whether the government has established a break in the illegal action and the evidence subsequently obtained. The Commonwealth argues that the break or the intervening circumstance occurred when Easterling's mother terminated the police interview. We agree.

When Easterling's mother terminated the interview, the police left the room and the illegal interrogation ceased. Although the conversation between Easterling, his mother, and his grandfather occurred in that same interrogation room, there was no further questioning by the police of either Easterling or his family. This change in circumstances effectively defeats any suggestion that purposeful police action produced the challenged evidence used against Easterling.

Of course, the illegally obtained confession certainly preceded Easterling's conversation with his family. Even so, the incriminating statements to Easterling's grandfather captured on the videotape were not an exploitation of that illegality but obtained by sufficiently distinguishable means. The incriminating statements were made as a direct result of a family member's question to Easterling, a situation not subject to police control. Under these circumstances, no police exploitation of the illegally obtained confession occurred, *i.e.*, the statement to the detective did not provide "a lead" to Easterling's unanticipated and yet-to-be-made incriminating statement to his family.

In sum, the brief videotaped statement used against Easterling was not an exploitation of any violation of his constitutional rights. Other than but-for

causation in the chain of events or "causation in the logical sense," the *Miranda* violation had nothing to do with the contents of Easterling's family conversation. Easterling's subsequent statements, made without further law enforcement involvement, were not an exploitation of the illegally obtained confession. Instead, there was attenuation between the events which dissipated the taint of the illegally obtained confession. Consequently, the trial court did not err by denying Easterling's motion to suppress premised upon his "fruit of the poisonous tree" argument.[8]

## II. THE TRIAL COURT DID NOT ERR BY DENYING THE MOTIONS FOR A MISTRIAL AND A NEW TRIAL.

Easterling next claims the trial court erred by denying his motion for a mistrial and a subsequent motion for a new trial.[9] We find no error in either ruling.

At Easterling's trial, the challenged video statement was played to the jury during the testimony of a Kentucky State Police detective. The Commonwealth, openly discussing with the Court the technology limitations

---

[8] Easterling also asks this Court to take notice of his status as a juvenile at the time of the conversation. Because this issue was not raised before the trial court, we decline to address it on appeal. *Henderson v. Commonwealth*, 438 S.W.3d 335, 343 (Ky. 2014).

[9] Kentucky Rule of Civil Procedure 59.01(a) provides in relevant part:

A new trial may be granted to all or any of the parties and on all or part of the issues [due to] . . . [i]rregularity in the proceedings of the court, jury or prevailing party, or an order of the court, or abuse of discretion, by which the party was prevented from having a fair trial.

involved with playing the tape, stated, "This tape . . . the portions of it that we're allowed to show by an earlier ruling, has been made part of the record . . . ." The jury then heard two snippets of conversation between Easterling and his grandfather, including the challenged statement, "He threatened my friend." The Commonwealth signaled it was finished playing the tape by stating, "That's the only part that we're going to play . . . . We've already introduced the main part of it, but this is obviously the only part . . . ." The judge truncated the rest of the sentence by announcing the admission of the videotape into evidence. Later, during closing argument, the Commonwealth stated in reference to Easterling and the recording, "He's just been handcuffed, he's just been questioned."

Easterling complains that these references to "what we're allowed to show," and to the detective's questioning of him which the jury did not see on videotape, must have raised questions in the jurors' minds about the contents of the remainder of the videotape. Easterling compares the Commonwealth's statements here to those in *Moore v. Commonwealth*, 634 S.W.2d 426 (1982), wherein the Commonwealth improperly made reference to a previously suppressed videotape by saying "Wish you could have heard it all." *Id*. at 437. This Court concluded that the only inference to be drawn from that statement was that the inadmissible part of the tape contained incriminating evidence. *Id*. at 438. Acknowledging that the Commonwealth's statements here are not as outrageous as those in *Moore*, Easterling insists the comments are still prejudicial and denied him a fair trial.

19

A mistrial should be granted only when there is a fundamental defect in the proceedings; the "occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way." *Gould v. Charlton Co.*, 929 S.W.2d 734, 738 (Ky. 1996) (citations omitted). Stated differently, "[a] mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity." *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002) (internal quotation and citation omitted). We review a trial court's denial of a mistrial and a new trial for abuse of discretion. *Slone v. Commonwealth*, 382 S.W.3d 851, 858 (Ky. 2012) (citation omitted) (mistrial); *Brown v. Commonwealth*, 174 S.W.3d 421, 428 (Ky. 2005) (new trial; allegations of juror misconduct reviewed under abuse of discretion standard).

Upon review, we cannot conclude that there was a fundamental defect in the proceeding when the Commonwealth, without referencing the videotape's content, made a statement that it would be playing the portion it was allowed to play and then did so. Likewise, a manifest necessity for a new trial was not created when the Commonwealth referenced Easterling being handcuffed and questioned. The video introduced during the detective's testimony contained Easterling's grandfather asking Easterling if he was handcuffed. While the Commonwealth could have been more careful in its phrasing, it did not state anything which had not been placed in the record through testimony. The comments were not outrageous and, as the trial court found, made no

reference to the suppressed statements, in compliance with the trial court's order. Given all of these factors, we conclude the trial court did not err in denying the motions for a mistrial or a new trial.

## III. THE TRIAL COURT DID NOT ERR BY ADMITTING CONTESTED CRIME SCENE AND AUTOPSY PHOTOGRAPHS.

Easterling's final claim of error challenges the trial court's admission of crime scene and autopsy photos which he deems inflammatory. He preserved this error by moving *in limine* to prohibit the Commonwealth's introduction of the photos, arguing their prejudicial effect outweighed their probative value. The trial court reviewed the photos individually and excluded approximately five. On appeal, citing *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015), Easterling argues that because the crime scene and autopsy photos were grisly and shocking, their inflammatory potential was substantially greater than their probative value, and they prejudiced the jury against him. Easterling contends that the photos were unnecessary to prove any point in controversy given that the photos demonstrated nothing that the testimony of the detective and the medical examiner would not prove, such as the cause and manner of death, namely the gunshot wounds.

The challenged crime scene photos depict the victim, Cole, fully clothed and lying on the ground in relation to the truck. A close-up photo reveals the injuries to Cole's mouth and his teeth. The autopsy photos show the gunshot wounds, lacking any disfigurement or gore.

In *Hall*, we considered Kentucky Rule of Evidence (KRE) 403 in the context of the admission of gruesome photographs. "[I]n all cases in which

visual media showing gruesome or repulsive depictions of victims are sought to be introduced over objection, as with all other types of evidence, the trial court must conduct the Rule 403 balancing test to determine the admissibility of the proffered evidence." *Id.* at 823. "When there is already overwhelming evidence tending to prove a particular fact, any additional evidence introduced to prove the same fact necessarily has lower probative worth, regardless of how much persuasive force it might otherwise have by itself." *Id.* at 824. Consequently, "the judge must consider the photographs within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's 'marginal' or 'incremental' probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence." *Id.*

Nevertheless, photos showing the nature of the victim's injuries and the circumstances surrounding the commission of the crime will rarely be deemed inadmissible. *Id.* at 827. The Commonwealth has the burden of proving a crime beyond a reasonable doubt. Consequently "[o]nly minimal probativeness to a fact of consequence is necessary for evidence to be relevant and thus generally admissible unless excluded by Constitution (federal or state), statute, or other evidentiary rule." *Id.* at 823 (n. 11, internal citations omitted).

*Hall* specifically reminds trial courts that under KRE 403 each piece of proffered evidence must be weighed individually.

> [Considering the specific context of the case,] [t]here are three basic inquiries that the trial court must undertake when determining admissibility of relevant evidence under Rule 403.

22

First, the trial court must assess the probative worth of the proffered evidence; second, it must assess the risk of harmful consequences (*i.e.*, undue prejudice) of the evidence if admitted; and last, it must evaluate whether the probative value is substantially outweighed by the harmful consequences. These inquiries are very fact intensive and are totally incompatible with bright line rules and rulings.

*Id.* at 823 (internal quotations and citations omitted).

"The balancing of the probative value of [the photos] against the danger of undue prejudice is a task properly reserved for the sound discretion of the trial judge." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Upon review, we find that the trial court appropriately weighed the prejudicial effect of each of the photos against its probative value within the full evidentiary context of the case. 468 S.W.3d at 823-24. We cannot find that the challenged photos, relevant and highly probative of the commission of the crime by Easterling and the nature and severity of Cole's injuries, were improperly admitted. *Id.* at 824-25.

Furthermore, although Easterling describes the crime scene and autopsy photos as "grisly and shocking," the photos are not of the same ilk as the gruesome photos described in *Hall*, but rather crime scene and autopsy photos similar to those routinely admitted into evidence. *See generally, Hall*, 468 S.W.3d at 821; *Ragland v. Commonwealth*, 476 S.W.3d 236, 249 (Ky. 2015). Even if some photos were cumulative evidence, admission of the photos was harmless. *See Combs v. Commonwealth*, 965 S.W.2d 161, 165 (Ky. 1998). Any prejudice did not outweigh the incremental probative value of the cumulative evidence. *Hall*, 468 S.W.3d at 824 (citations omitted). In sum, we conclude the

trial court's decision to admit the photos was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *English*, 993 S.W.2d at 945.

## CONCLUSION

For the foregoing reasons, the Mercer Circuit Court's judgment is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Ephraim Woods Helton
Stacy Coontz
Matthew Robb Walter
Helton, Walter & Associates

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General